# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | | |
|---|---|---|
| **EDWARD ALLEN COWARD and LARRY W. RANCHER** | * | **CIVIL ACTION NO. 04-2124** |
| | * | **JUDGE JAMES** |
| **VERSUS** | | |
| | * | **MAGISTRATE JUDGE HAYES** |
| **GLORIA DICKENS, ET AL** | | |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are a Motion for Summary Judgment filed by plaintiffs, Edward Allen Coward ("Coward") and Larry W. Rancher ("Rancher"), (Document No. 31) and a Motion for Summary Judgment filed by defendants, the Town of Delhi ("Town"), its Mayor, Lynn Lewis ("Lewis"), and Delhi's Board of Aldermen ("Board"), Shirley McDade, Mary McIntyre, Perry Smith, W.B. Sumner, and Dan Tolar. (Document No. 34). For reasons stated below, it is recommended that the plaintiffs' motion be **DENIED,** that the defendants' motion be **GRANTED, and this matter dismissed with prejudice at defendants' cost.**

## BACKGROUND

On October 14, 2004, plaintiffs filed this voting rights action seeking damages, various declaratory judgments, and injunctive relief. The plaintiffs allege that the defendants, in conjunction with other federal and state government officials[1], violated sections 2 and 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, *et seq.*, 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment, and the right to vote and due process clauses of the

---

[1] On February 2, 2005, the Court granted plaintiffs' Motion for Voluntary Dismissal (Document No. 19) of the following defendants: W. Fox. McKeithen, Secretary of State of Louisiana; Angie LaPlace, Commissioner of Elections for Louisiana; Gloria Dickens, Registrar of Voters for Richland Parish, Louisiana; and the Richland Parish Board of Elections Supervisors.

Louisiana Constitution. The alleged violations by the defendants arise from their failure to hold scheduled Board elections in 2002, their protracted delay through submitting inadequate re-apportionment plans to the Department of Justice ("DOJ") for pre-clearance, and their holding elections for Mayor and Chief of Police in 2002 despite not being able to also hold Board elections.

The Town, a jurisdiction subject to the Voting Rights Act ("Act"), has certain obligations with respect to holding and maintaining fair, open, and transparent elections. Louisiana law requires the Town to examine its apportionment plan of municipal districts following the official release of every decennial census to determine if there exists any substantial variation in the representation of the districts. La. Rev. Stat. Ann. § 33:1371(A)(1). This examination must occur within six months of the official release of a decennial census; therefore, for the census conducted in 2000 and released in April 2001, the Town was required to have its examination completed by September 2001. *Id.* at § 33:1371(A)(2); § 33:321. If, after this examination, the Town determines that a substantial variation exists in the representation of the Town's districts such that the Town's existing apportionment plan is no longer equitable, it must reapportion the districts to reflect the statistics from the decennial census. *Id.* The resulting apportionment plan must be approved by the Town before the end of the year following the year in which the decennial census is conducted and, in this case, before December 31, 2001. La. Rev. Stat. Ann. § 18:1922(A).

Reapportionment of municipal districts, however, represents a change in the Town's election procedures and therefore subjects it to section 5 of the Voting Rights Act. Accordingly, the Town must refrain from enacting or administering any change affecting voting, including a reapportionment plan, until the Town has sufficiently demonstrated to either the Department of

Justice or the United States District Court for the District of Columbia that the change does not have the purpose or effect of discriminating on the basis of race or color. 42 U.S.C. § 1973(c); 21 C.F.R. §§ 51.1-51.25.

The last Board elections occurred on October 3, 1998, and under Louisiana law, the next elections were scheduled to be held in October 2002. Pursuant to Louisiana law, a municipality is obligated to examine the apportionment plan of its municipal districts after every decennial census, and if a new plan is required, then it must be adopted within certain deadlines and receive clearance from the DOJ. A review of the minutes from meetings of the Mayor and Board of Aldermen reveals the following about the defendants' actions in attempting to fulfill their obligations following the official release of the 2000 census.

At a meeting held on September 27, 2001, the Board completed its examination of the Town's apportionment plan and concluded, as indicated in Ordinance No. 580, that "the current apportionment plan must be reapportioned and such reapportionment plan must be submitted to appropriate State and Federal authorities." Def.s' Exhibit 1. On December 10, 2001, the Board voted on two of five apportionment plans, Plan 4 and Plan 5, created by the Town's reapportionment consultant, David Creed ("Creed") of the North Delta Planning and Development District, Inc. ("North Delta"); Plan 4 prevailed and was introduced on January 14, 2002. On March 11, 2002, after public hearing, the Board adopted Plan 4 for submission to the DOJ for pre-clearance pursuant to section 5 of the Voting Rights Act, and it was submitted on April 30, 2002.

On June 28, 2002, the DOJ informed the Board that it did not have sufficient information to determine whether Plan 4 had the purpose or effect of denying or abridging the right to vote on the basis of race, color, or membership in a language minority group and requested additional

3

information. Roughly a month later, on July 30, 2002, the Board complied with the DOJ's request. By September 19, 2002, however, Plan 4 still had not received DOJ pre-clearance, and the Board subsequently withdrew the plan from consideration. Thus, no elections could be held in October of 2002. For the next year, the Board took no action toward completing the reapportionment or submitting an alternative plan to the DOJ, even though the Board had originally ordered North Delta to prepare five separate plans. Finally, on September 30, 2003, the Board adopted Plan 2, one of the five original plans North Delta had created, and submitted it for DOJ pre-clearance. As with Plan 4, the DOJ requested additional information from the Board, this time on two occasions, December 15, 2003, and March 2, 2004. The Board did not provide the requested information until February 14, 2005, when North Delta responded to the DOJ's requests.

On April 25, 2005, after a year and a half review, the DOJ denied pre-clearance of Plan 2 noting that the evidence the Board and North Delta provided did not allow it to conclude that Plan 2 did not have either the effect or purpose of discriminating against minority voters. The DOJ placed particular emphasis on circumstantial evidence indicating that the Board had submitted reapportionment plans with the intent of retrogressing minority voting strength, including the Board's rejection of Plan 5, a less-retrogressive apportionment plan originally presented to the Board in 2001, and North Delta's admission that Plans 4 and 2 did not best satisfy the redistricting criteria and retrogressed minority voting strength. Pl.s' Exhibits. As guidance to the Board, the DOJ indicated that it would accept Plan 5 or a plan based on a sample it had created for illustrative purposes. *Id.* Consequently, the Board heeded the DOJ's advice and on June 13, 2005, approved Plan 5 and submitted it to the DOJ for pre-clearance. The DOJ granted pre-clearance on August 3, 2005, and Board elections were held on October 15, 2005.

In addition to the Board's back and forth with the DOJ between 2001 and 2005, the plaintiffs' allegations also involve the Town's mayoral and Chief of Police elections from 1998 and 2002 and several annexations of territory. On October 3, 1998, the Town held a primary election for Mayor, and the white candidate, Jimmy Hopson ("Hopson"), defeated the black candidate. During the following two years, the Town, with pre-clearance from the DOJ, annexed two territories. The first annexation occurred on December 14, 1998, and included an area with 43 white and 33 black citizens of voting age, while the second occurred on May 8, 2000, and included an area with 135 white and zero black citizens of voting age. In April 2002, a special at-large election was held to fill the unexpired term of Hobson, the incumbent mayor, and, again, the white candidate, Lynn Lewis ("Lewis") defeated the black candidate, Larry Rancher, one of the plaintiffs in this suit. The following October, the Town held its scheduled at-large elections for Mayor and Chief of Police, and the respective white candidates, Lewis and Byron McKinley, defeated the respective black candidates, plaintiff Edward Allen Coward and Rufus Carter. Finally, on December 9, 2002, the manager of Willow Haven Apartments ("Willow Haven"), an apartment complex contiguous with the Town's southern boundaries and containing mostly black citizens, filed a request for annexation with the Town so that the complex could receive certain municipal services. The Town took no action, and a representative of Willow Haven renewed the request in September 2004. Again, the Town took no action.[2]

---

[2] Although it is not clear from the complaint, the plaintiffs appear to imply that the Board deliberately failed to annex Willow Haven to dilute minority voting strength in the Town's at-large mayoral and Chief of Police elections. The plaintiffs have neither properly framed this claim under any statute, nor have they even addressed it in their Motion for Summary Judgment or opposition to the defendants' Motion for Summary Judgment. Regardless, Willow Haven applied for annexation in December 2002, after the October elections, and may still be annexed by the time the next mayoral and Chief of Police elections are held in October 2006. Presently, any existing claims the plaintiffs have are not yet ripe for review.

Based on the events described above and the plaintiffs' complaint, the plaintiffs' allegations of violations of the Voting Rights Act and other statutes can be categorized into two broad wrongs: (1) the defendants, by failing to submit timely and adequate apportionment plans and thereby precluding a Board election in compliance with section 5 of the Voting Rights Act, deprived the plaintiffs an opportunity to exercise their right to vote; and (2) the previous at-large mayoral and Chief of Police elections in 2002, which were held despite not being able to hold Board elections, violated sections 2 and 5 of the Voting Rights Act because they were not held in accordance with Louisiana election law and "lower[ed] the turnout of the Black voters of the Town." Pl.s' Motion for Summary Judgment, p. 6. The plaintiffs have requested summary judgment on all of their claims.

The defendants deny all of plaintiffs' allegations and have requested summary judgment on the following issues: (1) monetary damages and attorneys fees are not recoverable under the Voting Rights Act; (2) plaintiffs' Voting Rights Act claims are moot; (3) plaintiffs have failed to prove any violation of the Voting Rights Act, the United States Constitution, or any other applicable theory of law.

**LAW AND ANALYSIS**

<u>Voting Rights Act Claims</u>

The primary statute on which the plaintiffs base their claims for damages and equitable relief is the Voting Rights Act ("Act") of 1965, 42 U.S.C. § 1973, *et seq.*, specifically sections 2 and 5. 42 U.S.C. §§ 1973, 1973c. Section 2 of the Act provides that no state or political subdivision shall impose any voting qualification or prerequisite to voting, or any standards, practices, or procedures which result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities. 42 U.S.C. §

1973(a). Furthermore, a violation of section 2 has occurred where the "totality of the circumstances" demonstrate that "the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected class] . . . in that its members have less opportunity to elect representatives of their choice. *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986) (quoting 42 U.S.C. § 1973(b)). Notably, the section explicitly states that while "[the] extent to which members of a protected class have been elected to office in the State or political subdivision" is one factor to consider, "nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). As the Supreme Court of the United States has confirmed, the precise question to be asked under a section 2 claim is "whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choices.'" *Thornburg*, 478 U.S. at 44.

Section 5 of the Act prohibits any state or political subdivision from enacting changes in its voting laws or procedures unless pre-clearance is obtained in one of two ways: (1) it may obtain declaratory judgment in the United States District Court for the District of Columbia that the changes will "not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," or membership in a language minority, or (2) it may obtain pre-clearance, via the Department of Justice, from the Attorney General. 42 U.S.C. § 1973c; 21 C.F.R. §§ 51.1-51.25. The purpose of section 5 is clear: "to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). When a specific change is challenged or presented for review to the Attorney General or United States District Court for the District of Columbia, the state or

political subdivision bears the burden of demonstrating by the preponderance of the evidence that the proposed change does not have a "retrogressive purpose and will not have a retrogressive effect." *Georgia v. Ashcroft*, 204 F.Supp. 2d 4, 8-9 (D.D.C. 2002).

**Mootness**

The defendants argue that the plaintiffs' claims under the Act are moot because Plan 5, which was submitted to the DOJ after the withdrawal of Plan 2 and the rejection of Plan 4, was pre-cleared by the DOJ on August 3, 2005, as not having the purpose or effect of retrogressing minority voting strength. Accordingly, the Board elections held on October 15, 2005, were entirely fair and lawful, and the plaintiffs no longer have a claim under the Act. As support for their position, the defendants cite *City of Dallas v. United States*, 482 F.Supp 183 (D.D.C. 1979), a case in which the United States District Court for the District of Columbia, a court designated in section 5 of the Act as able to pre-approve voting changes, dismissed a declaratory action by the City of Dallas to determine the validity of a voting plan for city council elections. *See* 482 F.Supp at 184. The court held that the case was moot because the original voting plan, which was the subject of the declaratory action, had been withdrawn, and a new plan, which received approval from the Attorney General, had been adopted instead. *Id.* at 185.

The plaintiffs' response to the defendants' mootness argument consists of an attempt to distinguish *City of Dallas*, general quotes on the doctrine of mootness, and a reiteration of their grounds for relief, including the defendants' failure to implement a reapportionment plan in conformity with the Act. Neither of these actions, however, changes the fact that since the plaintiffs first filed this action challenging the defendants' delay in adopting a reapportionment plan and holding Board elections, the DOJ has pre-cleared a lawful reapportionment plan and Board elections have been held. There is simply no prerequisite, qualification, or change in the

8

election law, pursuant to sections 2 and 5 of the Act, that the Town or defendants are attempting to put in place. Furthermore, the changes that were put in place since this action commenced, namely Plan 5, was done on the advice of the DOJ and with its ultimate approval. No claim under the Act currently exists.

The plaintiffs assert that their claims under the Act are not moot because a defendant's voluntary cessation of a challenged practice ordinarily cannot render a claim moot, and the defendants must demonstrate that the challenged practice could not reasonably be expected to recur. *See Friends of Earth , Inc. v. Laidlaw Environmental Service, Inc.*, 528 U.S. 167 (2000); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982). The plaintiffs correctly cite these principles of mootness; however, the facts of this case clearly indicate that the challenged activity, the defendants' delay in adopting an adequate apportionment plan, could not reasonably be expected to recur. Pursuant to state and federal law, the next opportunity to reapportion the Town's municipal districts will not exist until after the next decennial census in 2010. Even then, however, reapportionment may not be necessary if no substantial variation exists in the representation of the Town's districts. Additionally, it cannot be said with any degree of certainty that the defendants will still be on the Board at that time or that they will intentionally delay adopting a reapportionment plan as they allegedly did here. In fact, a review of the Secretary of State's website shows that, according to the certified results of the election held on October 15, 2005, three of the four defendants, all incumbents on the Board, either did not run for re-election or were defeated in the election. If reapportionment is necessary in 2010, the plaintiffs may have also relocated from the Town. Finally, the DOJ's admonishment to the Town when it rejected Plan 4 should serve as a warning to the Town that any future reapportionment must be done fairly and should indicate clearly that the plan has neither the purpose nor effect of retrogressing

9

minority voting strength.

**Damages**

In addition to declaratory and injunctive relief, the plaintiffs also seek damages for the defendants' alleged violations of the Act. The plaintiffs, however, have failed to provide this Court with any authority supporting a claim for civil damages under the Act; the defendants, meanwhile, have cited numerous cases to the contrary. *See Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985); *Moseley v. Price*, 300 F.Supp 2d 389 (E.D.Va. 2004); *United States v. Berks County*, 250 F.Supp. 2d 525 (E.D.Pa. 2003); *Foreman v. Dallas County*, 990 F.Supp. 505 (N.D.Tex. 1998). Indeed, no section of the Act contains language providing for statutory damages remedies. *See generally* 42 U.S.C. § 1973, *et seq.* Furthermore, in the nearly forty years since the Supreme Court first decided *Allen v. State Board of Elections*, 393 U.S. 544 (1969), the Court's landmark voting rights act case, it has not expanded its holding that private litigants have an action against state officials for declaratory and injunctive relief under the Act. *Id.* at 555. The Court of Appeals for the Ninth Circuit stated in a case in which it affirmed the absence of a right to damages under the Act that "[e]quitable relief suffices to fulfill the purpose of the statute, which is to ensure the right to register and vote at the polls." *Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985). This is no more true than in this case where the plaintiffs, at the time the suit was filed, sought a declaration that the defendants' failure to adopt an adequate re-apportionment plan violated the Act and an injunction preventing the defendants from holding an election with "unconstitutionally malapportioned" municipal districts. Damages in this circumstance would not have enabled the plaintiffs to register, vote at the polls, or overcome the

alleged wrongs; therefore, the plaintiffs' claim for damages under the Act must fail.[3]

**Section 2 and the Town's Mayoral and Chief of Police Elections**

The plaintiffs' only claim under the Act that is not moot is the allegation that the Town's mayoral and Chief of Police elections held in 2002 "lower[ed] the turnout of the Black voters of the Town" because they were not held alongside Board elections and violated section 2 of the Act. Nevertheless, this claim is baseless, because elections for those offices are conducted on an at-large basis and are not affected by districts or apportionment plans. As the defendants properly note, no violation of section 2 could have occurred because "[i]t is simply not possible to dilute votes in an at-large election when every citizen's vote counts equally," regardless of the district in which that citizen resides. Def.s' Opposition to Plaintiffs' Motion for Summary Judgment, at 12. The plaintiffs have failed to establish how the absence of a Board election diluted minority votes in an at-large election.

<u>Section 1983 Claims</u>

The plaintiffs also seek to recover monetary damages from the defendants under 42 U.S.C. § 1983. To recover against the individual defendants, however, the plaintiffs must establish two essential elements: (1) that the challenged conduct occurred under color of state law; and (2) that the conduct deprived them of rights, privileges, or immunities secured by the United States Constitution or federal law. *See* 42 U.S.C. § 1983; *Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). While there is no question that the defendants acted under color of state law when they sought to reapportion the Town's districts and submit a plan to the DOJ,

---

[3] Although the issue is not presently before the Court, the undersigned notes that while the plaintiffs have not alleged any theory of recovery entitling them to damages, they may be entitled to reasonable attorneys' fees as the "prevailing party" in this litigation. *See* 42 U.S.C. § 1973l(e). As this issue has not yet been fully briefed, any request for attorneys' fees shall be made on motion pursuant to F.R.C.P. Rule 54 and in compliance with this district's local rules.

there is no evidence that their actions deprived the plaintiffs of some federal right or even that they violated any federal law. The plaintiffs insist that the defendants violated numerous provisions of the Constitution and the Act, including the "one person, one vote" guarantee derived from Article 1, Section 2 of the Constitution, the Equal Protection Clause of the Fourteenth Amendment, and the right to vote secured by the Fifteenth Amendment. The plaintiffs' claims stem from their inability to vote for members of the Board because the defendants did not approve and submit a reapportionment plan capable of receiving pre-clearance from the DOJ and therefore did not hold Board elections between 1998 and 2005. These actions, however, do not amount to violations of the constitutional provisions cited above. No Board elections were held and therefore no one voted for those positions between 1998 and 2005. Because federal and state law required the Town to submit reapportionment plans to the DOJ and refrain from holding elections until the plans were approved, no election could be held during that time. *See* La.. Atty. Gen. Op. No. 02-14, 2002 WL 388783 (La. A.G.). The constitutional provisions that the plaintiffs cite protect against particularized harms or at least those where there is some classification or differential treatment. It is not as if the plaintiffs applied to vote or appeared at a voting precinct and were subsequently turned away. Instead, no election was held because an election held under the old plan or under an unapproved reapportionment plan would itself have violated federal and state law.[4]

Similarly, none of the defendant's actions violated sections 2 and 5 of the Act. As stated above, section 2 protects against the imposition of any voting qualification or prerequisite to

---

[4] To the extent that the plaintiffs have asserted violations of Sections 1 and 10 of Article 1 of the Louisiana Constitution, the same analysis applies. The defendants' actions affected the Town's entire electorate in that no election was held. Furthermore, that missed opportunity did not result from an affirmative denial by the defendants, but was required under state law as attempts were being made to adopt a legal reapportionment plan.

voting, or any standards, practices, or procedures which result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities. 42 U.S.C. § 1973(a). Section 5 merely requires all states and political subdivisions to submit to either the United Stated District Court for the District of Columbia or the Attorney General for pre-clearance all proposed changes to election procedures. The defendants neither attempted to impose any voting qualification or practice in violation of section 2[5], nor held an election without complying with section 5. Indeed, this litigation arises from the defendants' attempts to obtain pre-clearance from the DOJ in accordance with federal regulations promulgated under the Act and their efforts to avoid imposing any voting procedure not approved by the federal government. Furthermore, the reapportionment plan that was imposed and used during the Board elections on October 15, 2005, was approved by the DOJ and is not challenged by the plaintiffs. In sum, under the facts of this case, the defendants did not violate any of the plaintiffs' constitutional rights, and the plaintiffs' claim for damages under section 1983 must fail.

State Tort Claims

A review of the plaintiffs' complaint shows that the plaintiffs sought to invoke the Court's supplemental jurisdiction for:

> claims of the denial of the right to vote and of the right to seek public office as an incident of the right to vote pursuant to the equal protection clause of the Constitution, the right to vote clause of the Louisiana Constitution, the due process

---

[5] The Supreme Court's summation of the basic inquiry in section 2 cases best illustrates the absence of any violation in this case. In *Thornburg*, the Court reiterated that the basic question under section 2 is "whether 'as a result of the challenged practice or structure plaintiffs do not have *an equal opportunity to participate in the political processes* and to elect candidates of their choices.'" 478 U.S. at 44 (emphasis added). The plaintiffs have not shown how they were deprived of an equal opportunity to vote when no elections were held and, consequently, no one was given an opportunity to vote. The plaintiffs had the same opportunity as every other white and black voter in the Town, which is to say that they had no opportunity because the election could not be held in compliance with state and federal law.

> clause of the Constitution, and the case and statutory law which place upon the Defendants elected officials of the Town of Delhi the duty to adopt a plan of electing the Mayor and Town Council members which conform to the one man one vote principle and the Voting Rights Law.

Pl.s' Complaint, ¶ 2. For the same reasons as stated above, no damages are recoverable under any of these theories of recovery. Furthermore, the complaint contains no allegations of a cause of action in tort or under Article 2315 of the Louisiana Civil Code. In the absence of a well-pleaded claim in tort, the plaintiffs have failed to state a cause of action for damages against the defendants under state law. The plaintiffs cite to Article 2315 only in their brief in opposition to the Motion for Summary Judgment. The deadline for amending the complaint has long since passed, and the plaintiffs may not simply amend their pleading in a brief. Therefore, they have no claim for money damages, and the defendants' Motion for Summary Judgment should be granted.

## CONCLUSION

Overall, while the plaintiffs have asserted a host of claims under a panoply of statutes and constitutional provisions, most are either moot or unsupported by the evidence. The plaintiffs' primary contention that the defendants' failure to obtain a pre-cleared apportionment plan and hold Board elections constituted a violation of the Act was rendered moot by the subsequent adoption of Plan 5 and elections in October 2005. The other aspect of the plaintiffs' claim under the Act that dealt with the Town's mayoral and Chief of Police elections is simply not valid as those elections are at-large. Additionally, none of the defendants' actions amount to constitutional violations that would give rise to a claim under 42 U.S.C. § 1983. Finally, the plaintiffs have failed to allege any cause of action in their complaint against the defendants involving Louisiana tort law. Therefore, **it is recommended that the defendants' Motion for Summary Judgment be GRANTED and that the plaintiffs' Motion for Summary Judgment**

**be DENIED.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 7th day of November 2005.

_____
KAREN L. HAYES
U. S. MAGISTRATE JUDGE

H:\04-2124.110705.rr.klh.frm